This is an action brought by the plaintiffs, as heirs of Mrs. E. M. Boney, to recover an interest in certain lands in and around the town of Wallace, in Duplin County, and to have set aside a deed made by Mrs. E. M. Boney to the defendant Paisley Boney, for said lands, the plaintiff alleging four causes of action: one being that the deed obtained by Paisley Boney from Mrs. E. M. Boney was obtained through fraud and undue influence; another alleging that the deed, though absolute on its face, was intended as a security for the debt due by Mrs. E. M. Boney to Paisley Boney; another that the deed was made to Paisley Boney in trust to hold for himself and the other parties plaintiffs and defendants; and the fourth that Mrs. E. M. Boney held the title in trust for herself and the plaintiffs and defendants, and that Paisley Boney took the deed with the knowledge of these facts, without paying value therefor.
Gabriel Boney, under whom all of the parties claim, was married twice, leaving children surviving him at the time of his death by each marriage, the plaintiffs and defendants being children of the second marriage and the issue of such children as had previously died.
During the lifetime of G. Boney he and two of his sons, namely, W. J. Boney and D. E. Boney, formed a copartnership and engaged in the mercantile business, which proved disastrous and resulted in the said firm executing a deed of assignment to G. J. Boney, another son of the said Gabriel Boney, the deed of assignment conveying among other things the land owned by W. J. Boney and the land owned by D. E. Boney and the land in controversy, which was owned by Gabriel Boney and known as his home place.
The assignee took charge of the assigned property, and in the course of the administration of his trust the real estate of W. J. Boney, D. E. Boney, and Gabriel Boney, which was conveyed by the deed of assignment, was by G. J. Boney put up and sold, and at the sale W. J. Boney's wife bought the real estate formerly owned by W. J. Boney, covered by the deed of trust; D. E. Boney's wife bought the real estate formerly owned by D. E. Boney and covered by the deed of trust, and Mrs. E. M. Boney bought the land in controversy which was formerly the property of Gabriel Boney, known as the home place, and deeds were made accordingly by (617) G. J. Boney, assignee.
There was evidence that the defendant Paisley Boney looked after his mother's business, and that he was trusted by her.
There was also evidence that he supported his mother until his death, 30 April, 1906, and that he also supported three single sisters until their marriage; Mr. Westbrook, a son-in-law of Mrs. Boney and a plaintiff, testifying on cross-examination as follows: "I first became acquainted *Page 502 
with the family of Mrs. E. M. Boney in 1896, and went there frequently for about twenty months up to the time of my marriage. They were furnished the necessities of life by their own efforts and by her son Paisley. I mean that they sewed and did things of that kind; I didn't mean that they took in sewing. My wife taught music. I don't know how much that amounted to. It would amount to something. During that time they had practically no income except what Paisley gave them. The farm yielded very little. There was Mrs. E. M. Boney and three girls living with her, from 18 and 19 to 24 and 25 years of age. They got along on mighty little. I don't know about the way they lived. I didn't know who paid for the clothes my wife was married in. I would have to say it was hearsay. From 1897, after I was married, up to the death of Mrs. E. M. Boney, they were supported by the same one who had supported them before. That was Paisley. I don't remember when Miss Lucy was married. I think it was a year or more after I was married. After she was married, the mother and Lula were left at the place. As far as I know, Paisley Boney continued to support them and bear all expenses. I never saw an account. If I answer, it will be from hearsay. I know that the burden of the family rested on Paisley's shoulders. Walter Boney was married at the time I became acquainted with the family, and did not contribute to the support of the family, to my knowledge. At the time I first knew the family, Ed. Boney was married and had a family. I am not positive about where he lived; I don't know whether he was in Georgia or North Carolina. I don't know anything about whether he contributed to the support of the family. I do not know of his having sent money to Ed. to (618) keep him out of trouble. I don't know of my own knowledge that Ed. Boney, after his marriage, often had to wire to Paisley Boney for assistance. I do not know of Paisley incurring large expenses in cases of sickness and things of that kind. Since I have been married I have not contributed anything to my wife's mother or single sister's support. I do not know whether Ed. Cowell and his wife have or not. It was understood that Paisley was working hard as an express messenger. I don't know about his buying chickens and eggs to make a living for the family. To my knowledge, he never refused them a single thing he was able to give them. I think he was exceedingly good to the girls."
The deed of Mrs. E. M. Boney to Paisley Boney is of date 6 September, 1897, and there was no evidence of any claim by the plaintiffs prior to the death of Mrs. Boney.
The plaintiffs offered to prove by G. J. Boney, the grantor in the deed to Mrs. Boney, conversations and transactions between them, tending to establish the second, third, and fourth causes of action. This *Page 503 
evidence was excluded under section 1631 of the Revisal, and plaintiffs excepted.
Plaintiffs also offered to prove by D. E. Boney, at the time of the purchase by Mrs. E. M. Boney, it was understood that she was buying for herself and children. This witness did not state there was any such understanding with Mrs. Boney, but that it was so understood between himself and W. J. Boney and G. J. Boney. The plaintiff admitted that they could not show knowledge on the part of Mrs. Boney, except by evidence of conversations by G. J. Boney, and the evidence was excluded, and plaintiffs excepted.
The plaintiff, Mr. Westbrook, testified, among other things, that he went to see the defendant Paisley Boney in May after the death of Mrs. Boney, and carried two letters written by W. J. Boney to Walter Boney; that he handed the letters to the defendant, and he appeared to read them; that after he read the letters, witness asked him what he proposed to do about the matters dealt with in the letters; that he waited some time; that witness repeatedly asked for a decision, and defendant finally said he would make no statement for fear he might say something he would regret later. (619)
The first of these letters bears date 16 August, 1908, and in it the writer says: "Paisley advertised and sold some lots on Main and Railroad streets, which realized good prices; 35 x 90 feet sold for $170 to $225 per lot; eight lots sold for $1,488, one-fourth cash, balance in one, two, and three years time; and he anticipates selling more, thereby reimburse him for the money he has so long been spending supporting the mother and sisters, also to reimburse Ed, for his outlay; then there will be a residue to be divided after your mother's death. Unless Paisley should be able to buy up the shares, which I think he would like to do, he will probably write you about the matter later — as soon as he can see his way clear to do so."
The second letter bears date 15 December, 1898, and in it the writer says: "As I told you in the first letter, there are divisions to be made in father's home place by Paisley; he has bought out the whole tract and paid off the debt, and now there is a residue, and he proposes to either give the others a share or pay them for their shares."
The plaintiffs offered the letters in evidence, and his Honor excluded them, and plaintiffs excepted.
The deposition of Mrs. Harriet Turner was taken at the instance of the defendants, and was on file.
The plaintiffs offered in evidence the cross-examination, and upon objection his Honor held that this could not be done, and that plaintiffs must introduce the whole of the deposition or none, and plaintiffs excepted. His Honor then excluded two questions and answers in the *Page 504 
examination in chief, objected to by the plaintiffs, leaving as the only part of the examination in chief read to the jury the following:
Q. Your name is Harriet C. Turner? A. Yes.
Q. How old are you? A. Seventy-six.
Q. What relation were you to Mrs. Elizabeth M. Boney? A. I was her sister.
The entire deposition was then admitted, except his Honor (620) excluded two questions and answers bearing on the second, third, and fourth issues, and the plaintiffs excepted.
There are other exceptions to the charge and to the refusal to give certain instructions.
His Honor entered judgment of nonsuit as to the second, third, and fourth causes of action, and plaintiffs excepted.
The jury returned the following verdict:
1. Was the deed from E. M. Boney to the defendant Paisley Boney, dated 6 September, 1897, procured by fraud and undue influence of the defendant Paisley Boney, as alleged in the complaint? Answer: No.
Judgment was entered upon the verdict in favor of the defendants, and the plaintiffs excepted and appealed.
The evidence of G. J. Boney, offered by the plaintiffs and excluded by the court, was incompetent under section 1631 of the Revisal.
He was one through whom plaintiffs and defendants claimed, and was offering to testify, in behalf of the plaintiffs and against the defendants, as to conversations and transactions with Mrs. E. M. Boney, deceased, to whom the witness had executed the deed, and from whom the defendant derived his title. Bunn v. Todd, 107 N.C. 267.
The witness D. E. Boney was examined by the court in the absence of the jury. He said, among other things, while speaking of the sale by G. J. Boney, assignee: "Before the sale that morning I and the two brothers consulted about it, and it was agreed that our wives would bid off our place, and the widow was to bid off her place. This money was to go to pay off the creditors, provided it would do it. It seemed to be the understanding that she was buying for herself and children by the second marriage, but I don't know what was said about that. I don't know whether she was to buy it off as widow or buy it off and hold it for her husband's heirs. I don't know that that was (621) explained. I don't remember any explanation about that." *Page 505 
The court then excluded the evidence upon the statement by counsel for plaintiffs that they could not prove knowledge of the agreement or understanding upon the part of Mrs. E. M. Boney, except by the evidence of G. J. Boney, which we have held was properly excluded. This ruling was correct, but his Honor might have gone further, as the evidence of Mr. Boney shows that he had no recollection of any agreement or declaration of a trust.
The letters written by W. J. Boney to Walter Boney fall clearly within the rule res inter alios acta, as they were not written by the defendant Paisley Boney, or to him, or by his authority.
We have not been able to find a direct adjudication in this State sustaining his Honor in excluding parts of the deposition of Mrs. Turner because the whole was not offered, but the authorities elsewhere are in accordance with his ruling. Killbourne v. Jennings, 40 Iowa 475; Schwartzv. Brunswick, 73 Mo., 257; Hamilton v. Milliken, 62 Neb. 117; S. v.Rayburn, 31 Mo. App. 386; Lanohan v. Lawton, 50 N.J. E., 276; Grant v.Pembry, 15 Kan. 242.
It is, however, immaterial, whether right or wrong, as the plaintiffs offered the whole of the cross-examination of the witness, and the examination in chief, which they were required to introduce, could not affect the case one way or the other, she testifying on the examination in chief to nothing except that her name was Harriet C. Turner; that she was 76 years of age, and was the sister Mrs. E. M. Boney.
The plaintiffs do not contend that the questions and answers in the deposition, excluded upon the objection of the defendants, were competent as they are presented, but that his Honor did not have the power to entertain the objections when the deposition was offered; but the answer to this contention is that his Honor acted upon an agreement of counsel that objections might be heard and passed upon by the judge at the trial.
Holding, as we do, that the evidence of G. J. Boney, D. E. Boney, and Mrs. Turner was properly excluded, there was remaining no evidence to support the second, third, and fourth causes of action, unless the conduct of the defendant Paisley Boney at the (622) time the letters were shown him by Mr. Westbrook is evidence of the facts alleged. Our Court recognizes the doctrine that silence in the presence of an accusation is some evidence of acquiescence in the charge, but we are admonished that it is so liable to misinterpretation and abuse that such evidence should be received with great caution, and should not be received at all, except under well recognized conditions. Tobacco Co. v.McElwee, 96 N.C. 74; S. v. Jackson, 150 N.C. 832.
As was said in Moore v. Smith, 14 S. R., 393, which is cited with approval in the Tobacco Co. case, supra: "Two men at this rate might *Page 506 
talk a third out of his whole estate with a witness! Nothing can be more dangerous than this kind of evidence. It should always be received with caution, and never ought to be unless the evidence is of direct declarations of that kind which naturally calls for contradictions — some assertion made to the man, with respect to his right, which by his silence he acquiesces in."
In 2 Chamberlayne Mod. Ev., secs. 1401 and 1402, the author notes a distinction between oral and written accusation. He says (sec. 1401): "Should a party to a litigation deny the truth of a statement made to him, no reason exists for introducing the fact in evidence as an admission that the statement was true. On the contrary, should the person addressed fail to deny the truth of the statement made to him, or in his presence, it has been thought that under cover of the very illusory maxim that `silence gives consent,' some rule of evidence of necessity renders admissible as against the party all which was said in his presence and not categorically or in substance denied by him. The dangers of establishing such a rule of procedure or canon of administration are obvious. No rights of a party whom any one saw fit to address concerning them would be safe under such a state of the law." Sec. 1402: "Experience shows that, in the case of the average man, a marked distinction exists between the readiness with which he will reply to an oral question and his readiness to answer, in writing, a written claim or demand. Those who are addressed directly, face to face, feel (623) a spontaneous impulse frequently, perhaps the result of habit, to deny a false declaration regarding a matter which intimately concerns them. In proportion as yielding to such an impulse would be natural, failure to do so is significant. No such intuitive suggestion is, as a rule, presented where statements are made in writing. Even where the initial impulse is to reply, the feeling frequently fails to persist until it becomes effective in a resultant denial. Delay removes spontaneity. A stage of deliberation intervenes. No immediate necessity for taking a definite position may be felt. In view of these and similar considerations, it can scarcely be said that any uniform natural impulse to traverse erroneous written statements exists under ordinary circumstances."
The accusation must be direct and of a character which calls for contradiction. "Acquiescence, to have the effect of an admission, must exhibit some act of the mind, and amount to voluntary demeanor or conduct of the party," and the circumstances must be such "as would properly and naturally call for some action or reply from men similarly situated." S. v.Jackson, supra.
One of the recognized conditions which justifies the exclusion of such evidence is that the accusation is made by a hostile party, and for the *Page 507 
purpose of procuring evidence, when silence may be the only wise and prudent course.
Judge Redfield says, in Mattocks v. Lyman, 16 Vt. 119: "But when the claim is made for the mere purpose of drawing out evidence, as in the present case it is obvious must have been the fact, or when it is in the way of altercation, or, in short, unless the party asserting the claim does it with a view to ascertain the claim of the person upon whom he makes the demand, and in order to know how to regulate his own conduct in the matter, and this is known to the opposite party, and he remains silent, and thereby leads the adversary astray, mere silence is, and ought to be, no ground of inference against any one. The liabilities to misapprehension, or misrecollection, or misrepresentation are such that this silence might be the only security. To say, under such a dilemma, that silence shall imply assent to all which an antagonist may see fit to assert would involve an absurdity little less gross than some of the most (624) extravagant caricatures of this caricature-loving age. With some men, perhaps, silence would be some ground of inferring assent, and with others none at all. The testimony then would depend upon the character and habits of the party — which would lead to the direct trial of the parties, instead of the case."
Applying these principles, we are of opinion that the conduct of the defendant, standing alone as it does, was not sufficient to have the second, third, and fourth causes of action submitted to a jury.
The witness who handed the letters to the defendant was a son-in-law of Mrs. Boney, and was endeavoring to procure evidence to be used on the trial of this action, which was instituted within six months thereafter. He made no charge himself which might have been expected to cause instant reply, but on the contrary handed the defendant letters and asked him to read them and say what he would do. The defendant had time for reflection, and knowing he was in the presence of a witness antagonistic to him, and that what he said might be misunderstood or misquoted, it was the part of prudence and wisdom to say nothing, for fear he might regret it. No direct charge was made in either letter, and if it may be inferred from the first that the writer intended to convey the idea that the residue would be divided because of an existing trust, the second goes far to destroy any such contention, as it is therein said that the defendant had "bought out the whole tract."
At most, the conduct of the defendant, under these circumstances, could have created no more than mere conjecture as to the existence of the causes of action, as to which judgments of nonsuit were entered.
We find no error in the trial of the issue submitted to the jury, and are of opinion the instructions to the jury were as favorable as the *Page 508 
plaintiffs had the right to expect. The rulings on the evidence of W. F. Murphy and Luther Carr are sustained by Smith v. Smith, 117 N.C. 326.
No error.
(625)